COURT OF APPEALS OF VIRGINIA

Present:  Judges Haley, Petty and Powell
Argued at Salem, Virginia


UTILITY TRAILER MANUFACTURING COMPANY AND
  LIBERTY INSURANCE CORPORATION
                                                        OPINION BY
v.      Record No. 1484-10-3               JUDGE JAMES W. HALEY, JR.
                                                         JULY 12, 2011
JOSHUA G. TESTERMAN


            FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        Robert M. Himmel (Christopher M. Kite; Lucas & Kite, PLC, on
        brief), for appellants.

        (D. Edward Wise, Jr.; Arrington, Schelin & Herrel, on brief), for appellee.
        Appellee submitting on brief.


                                    INTRODUCTION

        The Workers' Compensation Act (the "Act") authorizes awards for lost wages resulting

from an "incapacity for work resulting from" injury.  Code § 65.2-500 *et seq*.  The issue here for

resolution is whether a furlough from work of pre-defined and limited duration, applicable to all

manufacturing employees, both those with and without restricted work capacity, justifies an

award for lost wages to a worker with restricted capacity, in the absence of evidence

demonstrating a causal relationship between that restriction and the wage loss.  We conclude

such an award under these circumstances is not authorized by the Act.

                                        FACTS

        The facts may be succinctly stated:

        As a result of an industrial accident he had as an hourly employee in the manufacturing

line at Utility Trailer Manufacturing Company ("Utility") on January 9, 2006, Joshua Testerman

("claimant") was awarded medical benefits, temporary total disability benefits, and permanent

partial disability. Claimant thereafter resumed his work as an hourly employee at Utility that same year in a manufacturing line position commensurate with his restricted work capacity. He has worked in that capacity at all times here relevant.

The plant manufacturing line was shut down from January 5 to January 9, 2009. All employees on that line were furloughed for this period. On March 11, 2009, claimant filed an application seeking "[c]ompensation for total wage loss . . . [f]rom January 5, 2009 [t]o January 9, 2009."

William Weaver, the human resources manager who had worked at Utility for twenty years, testified that the manufacturing line was shut down that week for an annual "physical inventory count." He testified that the inventory count is usually held "the first full week in January," because "you cannot run manufacturing while we're doing physical inventory. You've got to stop everything and do accounts." He further testified that every employee was informed verbally of that week-long shutdown, specifically the "start and end date," and notice of the same was posted in the factory hallway. That posted notice is part of the record before us. He further testified, "[w]e told them [the manufacturing employees] we were shut down for one week only."[1] In short, since the need for manufacturing production traditionally slowed in January, it was in that month that the annual inventory was held.

At the hearing before a deputy commissioner, claimant testified as follows:

> Attorney: And after January 9th did you return back to your light duty job?
>
> Claimant: Yes, sir.
>
> Q.: And have you continued to work it since that time?

---

[1] The record reflects that some salaried non-production line employees were not furloughed, as they were needed to conduct the inventory. In past years, but not in the furlough period here under consideration, some hourly wage manufacturing employees, like claimant, were used in the physical inventory process. However, when so used, they were chosen to participate on the basis of seniority.

A.: Yes, sir.

　　　　*　　*　　*　　*　　*　　*　　*

Q.: . . . you understood when you went out that it was for this period of time, a limited defined period of time, and that you'd be brought back right in at the end of that week?

A.: Yes, sir.

In addition to the foregoing, claimant testified he thought the week work stoppage developed because: "[W]e was [sic] slow on work." Claimant acknowledged there had been an annual inventory during the first week of January every year of the five years he had worked for Utility. Nonetheless he claimed, in contradiction to the testimony of William Weaver, that he had worked production during those prior inventories.

Finally, narrowing our inquiry: (1) the parties have stipulated that claimant adequately marketed his residual work capacity during the week of January 5-9, 2009;[2] (2) upon inquiry by the deputy commissioner as to whether the shutdown resulted from "an economic downturn," counsel for employer replied: "Yes, just the plant closed for inventory. It's a combination of those two things. I think they both really come under the guise of the causation defenses."; and (3) claimant returned to work following the shutdown at his same salary.

_____

[2] We note that a claimant is required to prove not just that he made reasonable efforts to market his residual capacity, but further, that his disability rendered him "unable to market his remaining capacity for work." Pocahontas Fuel Co., Inc. v. Agee, 201 Va. 678, 681, 112 S.E.2d 835, 837 (1960) (cited with approval in Washington Metro. Transit Auth. v. Harrison, 228 Va. 598, 600, 324 S.E.2d 654, 655 (1985)); see also County of James City Fire Dep't. v. Smith, 54 Va. App. 448, 454, 680 S.E.2d 307, 310 (2009). The record in this case shows that claimant went to five places on January 5, 2009 (the first day off during the shutdown). Three were not hiring anyone, one was hiring only management, and the other did not have any job applications available. See App. at 36. No other efforts were made. That said, those efforts do not show that claimant was unable to obtain employment because of his restricted work capacity; rather, they show that even those also laid off during the shutdown, without any restricted work capacity, would likewise have been unable to obtain employment from the same potential employers claimant contacted.

- 3 -

By opinion dated July 29, 2009, a deputy commissioner rejected employer's defense that the wage loss "was not causally related to" claimant's restricted capacity. Rather, relying upon Metro. Mach. Corp. v. Sowers, 33 Va. App. 197, 532 S.E.2d 341 (2000), she awarded lost wage benefits because claimant's "ability to compete economically . . . with co-workers . . . attempting to find work during a lay-off, is permanently impaired."

By opinion dated June 9, 2010, a majority of the commission affirmed, specifically adopting the deputy's reasoning. Testerman v. Utility Trailer Mfg. Co., 226-77-65, 2010 VA Wrk. Comp. Lexis 290 (Jun. 9, 2010). Dissenting, Commissioner Williams noted that the claimant "did not lose wages because of his impaired capacity, but he lost wages, as did his co-workers, because of the employer's shut-down." Id. at *12. He continued: "A period of one week is simply of insufficient duration to reasonably conclude that the claimant's ability to obtain other light duty work was the result of his disability as opposed to some other cause." Id. at *12-13. He concluded that the effect of the commission's decision placed claimant "*in a better position than his co-workers* because of his disability without any showing that his disability had made him any less likely to find employment than his co-workers during the same period." Id. at *13 (emphasis added).

## ANALYSIS

Our analysis begins with a review of our cases relevant to the inquiry.

In Metro Mach. Corp., 33 Va. App. at 202, 532 S.E.2d at 343-44, "the majority of the company's work force was laid off *solely* for economic reasons," on March 28, 1997. (Emphasis added.) This included Sowers, a restricted capacity employee. The layoff was of then undefined duration.[3] "Claimant sought and received unemployment benefits." Id. at 202, 532 S.E.2d at

---

[3] In November 1997, eight months later, all laid-off employees, including Sowers, were recalled to work, apparently because of improved economic conditions.

344. He further sought temporary total and temporary partial disability benefits under the Act. We rejected, as had the commission, the employer's defense that "because the layoff was plant wide and economic in nature, claimant was not entitled to disability benefits because his lack of work was unrelated to his injury." Id. at 208, 532 S.E.2d at 347. We found a causal relationship because claimant's opportunity to engage in work was limited by his restricted capacity and "[t]hus, he did not have the same . . . ability as other [not restricted capacity] employees to find other employment." Id. at 209, 532 S.E.2d at 347.

In Carr v. Va. Elec. & Power Co., 25 Va. App. 306, 309, 487 S.E.2d 878, 880 (1997), the commission had denied the claimant benefits, finding that he, a restricted capacity lineman, had lost overtime because of "purely economic factors unrelated to the accident." We reversed, holding that business or economic conditions did not diminish employer liability for lost wages when other non-restricted capacity linemen "continue[d] to receive overtime" wages during "the [time] period in question." Id. at 312, 487 S.E.2d at 881. Thus, we concluded there was a causal relationship between the overtime wage loss and the earlier injury.

In Consol. Stores Corp. v. Graham, 25 Va. App. 133, 486 S.E.2d 576 (1997), the injured hourly employee, formerly a stocker, returned to light-duty work as a sales person. Her hours were reduced as a sales person, according to Consolidated, because of a down turn in business. In affirming a wage differential award, we held that "the employer's financial condition and the availability of alternative work do not affect the claimant's right to compensation due to an impaired capacity to perform his pre-injury duties." Id. at 137, 486 S.E.2d at 578.

Three factors are common to each of the foregoing cases: (1) the suspension or reduction of work for each claimant began or continued for an *undefined duration*; (2) by comparison with non-restricted employees, wages were lost; that is, Carr lost overtime compared with non-restricted linemen, Graham had fewer hours as a sales person than as a stocker, and Sowers'

- 5 -

physical restrictions diminished his ability to find work compared to non-restricted co-workers; and (3) the causal relationship between the wage loss and the injury was established by the evidence.

The commission has also considered cases similar to the instant case, but in each of the following cases, one or more of the three above-noted factors are absent.

In Jones v. Genie Co., No. 166-97-76, 1998 VA Wrk. Comp. LEXIS 4046 (Dec. 3, 1998), employer's plant closed from December 23, 1997 to January 8, 1998 for annual maintenance and repairs. All employees, including the restricted work claimant, were furloughed for that period. In denying the claim for lost wages, the commission wrote:

> In this case, the claimant, like all of the . . . other employees, did not work for two weeks because of the annual closing for repairs and maintenance. She did not lose wages because of her impaired capacity, but she lost wages, as did her coworkers, because of the shutdown and would have lost the wages in her pre-injury job. If the claimant were to receive benefits for the brief shutdown period, she would be in a better position than her coworkers because of her disability.

Id. at *4.

The commission continued:

> While two weeks is not considered to be a long enough period to require marketing, it is also not a sufficiently long period to make a finding that a partially disabled worker is disadvantaged when all other employees are also out of work. This differs from a case where the shutdown is long-term and the employee, after a reasonable marketing effort, shows that the disability restricted alternative employment opportunities.

Id.

The commission was faced with similar circumstances in Rodriguez v. Stouffer Concourse Hotel, No. 160-73-71, 2005 VA Wrk. Comp. LEXIS 3984 (Dec. 21, 1998). On December 14, 1997, Stouffer, a restricted worker, and all other employees, were told that the hotel would be closed for six weeks for renovation and that he, and all other employees, would

be rehired when the renovation was complete. He was rehired on January 31, 1998. In denying

the claim, the commission wrote:

> Here, the claimant suffered a wage loss because the employer
> undertook a renovation project. The project . . . was for a definite,
> relatively fixed period. The employees in [Consol. Stores Corp.]
>  . . . and Graham, however, suffered wage loss for an indefinite
> period. These cases, therefore, stand for the proposition that an
> employer may not escape liability for a partial wage loss by
> indefinitely eliminating a light-duty assignment for "economic
> reasons." . . . Here the claimant was out of work for approximately
> six weeks because of the renovation project. The claimant was not
> singled out by the employer, but was treated similarly to all
> employees whose work was affected by the renovation. Thus, we
> find that the claimant did not lose wages because of any impaired
> capacity, but because of the renovation.

Id. at *3, 6.

Commentators have noted the issue here for resolution. In 4 Arthur Larson & Lex K.

Larson, Larson's Workers' Compensation Law, § 84.03 (2004), that commentator writes, "[i]t is

not difficult to phrase a plausible rule: Loss of employment should not be deemed due to

disability if a worker without the disability would lose employment or suffer a reduction in

earnings under the same economic conditions—but whether this formula can be applied with any

precision may be open to question."

Any attempt at precision requires a delineation of factors for consideration in establishing

those "same economic conditions." We find they include: (1) the length of any furlough from

work; (2) whether that furlough included *all* employees, restricted or not, of the same class;

(3) the reason for the furlough; (4) whether the term of the furlough was pre-determined by the

employer; and (5) whether employees were offered employment at the termination of the

furlough. These factors address the fundamental issue in these cases: is any wage loss causally

related to the injury?

In this case, the furlough was for one week, based upon a combination of an annual slow down in manufacturing needs and an annual physical plant inventory. All workers in the manufacturing line, with or without restricted work capacities, were furloughed. The furlough was pre-determined as to length. All employees, with or without restricted work capacities, were advised they could return to work at the end of the furlough, as did claimant. There was no confluence of all of these factors in Metro, Graham, or Carr. Here, claimant was off for one week. As the dissenting commissioner wrote, "[a] period of one week is simply of insufficient duration to reasonably conclude that the claimant's ability to obtain other light duty work was the result of his disability . . . ." This was the same conclusion reached by the commission in Jones, where the furlough was for *two* weeks.

As noted above, claimant's efforts to obtain work on January 5, 2009, were unsuccessful, as would have been the efforts of his fellow furloughed employees without work-restricted capacity, because the potential employers contacted simply were not hiring. Accordingly, it was not claimant's limited work capacity, when compared with non-restricted fellow employees, that caused his lack of employment. And it was claimant's burden to demonstrate the causal relationship between his loss of wages and his injury. Moreover, as noted by the dissenting commissioner, if claimant were awarded benefits for lost wages, he would be "in a better position than his [non-restricted] co-workers . . . ."

We do not believe the dissent properly addresses our decision.

We hold only that during a furlough a condition precedent for an award to a partially incapacitated employee for lost wages (or diminution in earning power) is a *causal relationship* between that incapacity and that loss. We do not assert that a partially incapacitated employee must prove an actual loss of wages during a period of furlough. We do assert that the loss of actual or potential wages must be *the result* of the partial incapacity. Indeed, the language of

- 8 -

Code §65.2-502 ("when the incapacity for work resulting from the injury is partial . . . .") admits of no interpretation but that a causal relationship is required. See Great Atlantic & Pac. Tea Co. v. Bateman, 4 Va. App. 459, 461, 359 S.E.2d 98, 99 (1987) ("Compensation for loss of earnings due to an injury is governed by Code §§ 65.1-54 and 65.1-55. Benefits under these sections for total and partial incapacity compensate the employee for loss of earnings resulting from the injury"), quoted with approval in Twenty-First Century Concrete v. Giacchina, 20 Va. App. 326, 331, 457 S.E.2d 379, 381 (1995); Crystal Oil Co. v. Dotson, 12 Va. App. 1014, 1020-1021, 408 S.E.2d 252, 255 (1991).

Our decision is limited in scope; it addresses only those cases where a partially incapacitated employee is *furloughed.* The five factors we developed are not rules. They are suggestions for analyzing, as we wrote above, "the fundamental issue in these cases: is any wage loss causally related to the injury?"

In Vega v. Jwayyed, 218 Va. 1026, 1032, 243 S.E.2d 228, 231 (1978), the Virginia Supreme Court wrote, "although we have repeatedly held that the provisions of the Workmen's Compensation Act are to be liberally construed, the Commission's ruling would engraft upon the Act a provision for unemployment insurance which could not be sustained."

That reasoning applies in this case. Claimant has not demonstrated that his lost wages were causally related to his injury. Accordingly, he may not look to the provisions of the Act for recompense. For these reasons, the decision of the commission is reversed and the claim for lost wages is dismissed.

Reversed and dismissed.

Petty, J., dissenting.

An injured employee is entitled to receive compensation when his "incapacity for work resulting from [an] injury is partial . . . during such [period of] incapacity." Code § 65.2-502. Today the majority has appended an additional prerequisite to the receipt of compensation—the employee must also establish that his loss of wages was not due to economic conditions that similarly impacted able-bodied employees. It then proceeds to announce, out of whole cloth, five factors to consider in applying its "same economic conditions" test.[4] In doing so, the majority, in my opinion, ignores both existing precedent and legislative intent and effectively alters both the spirit and the letter of the Worker's Compensation Act. Accordingly, I dissent.

I believe that this case is primarily a question of statutory interpretation. This Court reviews such a question *de novo*. Town of Waverly Law Enforcement v. Owens, 51 Va. App. 277, 280, 657 S.E.2d 161, 163 (2008). When interpreting a statute, this Court must consider the statute's language "to determine the General Assembly's intent from the plain and natural meaning of the words used." Alcoy v. Valley Nursing Homes, Inc., 272 Va. 37, 41, 630 S.E.2d 301, 303 (2006). "[W]ords are to be given their ordinary meaning, unless it is apparent that the legislative intent is otherwise." Phelps v. Commonwealth, 275 Va. 139, 142, 654 S.E.2d 926, 927 (2008). And, "[this Court] must assume that 'the legislature chose, with care, the words it used when it enacted the relevant statute, and we are bound by those words as we interpret the statute.'" Rasmussen v. Commonwealth, 31 Va. App. 233, 238, 522 S.E.2d 401, 403 (1999) (quoting Frazier v. Dep't of Soc. Servs., Div. of Child Support Enforcement ex rel. Sandridge,

---

[4] The majority has announced five specific factors to consider in the application of its newly minted wage loss test. Supra at 7. Significantly, however, it fails to point to any portion of the Act to support these factors, leaving one to conclude that they must have been gleaned from the "'penumbras and emanations' of [the Act]." Carpenter v. Commonwealth, 51 Va. App. 84, 96, 654 S.E.2d 345, 351 (2007) (quoting LaRoche v. Wainright, 599 F.2d 722, 726 (5th Cir. 1979)).

27 Va. App. 131, 135, 497 S.E.2d 879, 881 (1998)). Moreover, it is this Court's "'duty . . . to interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal.'" Oraee v. Breeding, 270 Va. 488, 498, 621 S.E.2d 48, 52 (2005) (quoting Va. Elec. & Power Co. v. Bd. of Cnty. Supervisors, 226 Va. 382, 387-88, 309 S.E.2d 308, 311 (1983)). "Thus, [this Court] 'will look to the whole body of [a statute] to determine the true intention of each part.'" Ford Motor Co. v. Gordon, 281 Va. 543, 549, 708 S.E.2d 846, __ (2011) (quoting Oraee, 270 Va. at 498, 621 S.E.2d at 52-53).

I find it significant that despite this Court's obligation to give effect to the intent of the legislature, the majority barely mentions the language of Code § 65.2-502 or any other section of the Workers' Compensation Act. Instead, the majority dwells upon what it perceives as factual similiarities in several relevant cases without analyzing what those cases have to say precisely about Code § 65.2-502. As with any question of statutory interpretation, this Court's inquiry should begin with the plain language of the statute itself. Surles v. Mayer, 48 Va. App. 146, 163, 628 S.E.2d 563, 571 (2006).

Under Code § 65.2-502, a claimant receives a payment designed to offset his "*incapacity for work* resulting from [his] injury" by paying him two thirds of the difference between his pre-injury average weekly wage and "the average weekly wage which he is *able to earn* thereafter."[5] (Emphasis added). This compensation is to be paid "*during such incapacity*." Id. (emphasis added). In lieu of these payments, however, the employer may provide his employee with selective employment—that is, a job the employee can perform even though partially

---

[5] The section goes on to describe a process for calculating the claimant's average weekly wage after the injury under certain special circumstances. See Code § 65.2-502(A) (setting forth an elaborate formula for calculating the average weekly wage after the injury in the presence of potentially volatile income earned by or from "commissioned employees, self-employed income, and income derived from an employer in which the injured worker or their immediate family has an ownership interest").

- 11 -

disabled, at wages equal to his previous wage. See Metro Mach. Corp. v. Lamb, 33 Va. App. 187, 196-97, 532 S.E.2d 337, 341 (2000). In such a case, the employee is not entitled to compensation—not because he is no longer suffering a disability, but because the difference between his pre-injury wages and the amount he is able to earn subsequent to the injury is zero. See id. However, once the employer ceases—for whatever reason—to take advantage of this accommodation, it must return to paying benefits to the worker so that he continues to receive payment for his pre-existing diminished earning capacity. Id.

This Court has already recognized these principles in Metro Mach. Corp. v. Lamb. There, this Court addressed an argument very similar to that presented by the employer in this case—that an employee, who was laid off from his light-duty employment as the result of a plant shutdown, and not as the result of a work-related injury, was not entitled to benefits due to the shutdown. Id. at 196, 532 S.E.2d at 341. This Court firmly rejected that argument, stating:

> The employer's reasons for the layoff should not diminish the employee's entitlement to benefits. The employee was injured on the job and his *capacity to work reduced.* The Workers' Compensation Act "is highly remedial and should be liberally construed to advance its purpose . . . [of compensating employees] for accidental injuries resulting from the hazards of the employment." See Henderson v. Central Tel. Co., 233 Va. 377, 382, 355 S.E.2d 596, 599 (1987) (citations omitted). *Until the employee can perform at his pre-injury capacity, he is protected from the economic vicissitudes of the market place.*

Id. at 196-97, 532 S.E.2d at 341 (emphases added). Accordingly, "[a]fter an economic layoff from selective employment, an employee remains entitled to benefits until he either fully recovers and is released to pre-injury work, or until the employer offers him other selective employment." Id. at 196, 532 S.E.2d at 341. Thus, this Court held that "the employee's layoff due to the employer's economic downturn does not preclude his entitlement to disability benefits." Id. at 197, 532 S.E.2d at 341.

Given our decision in Lamb, I can see no reason why we ought to do anything but affirm the commission's award of benefits in this case. The majority acknowledges the fact that Testerman is a "partially incapacitated employee," supra at 9, but simply does not think it a good policy to give what it views as a windfall payment for wages to an employee that the employee would not have otherwise earned even if he had not suffered an industrial injury. The entire purpose of the majority's new test is to give effect to this policy decision. Yet, the legislature made a certain policy choice, and it is that decision we must honor. That policy compensates an injured employee for his diminished earning capacity. See, e.g., J.A. Foust Coal Co. v. Messer, 195 Va. 762, 765-66, 80 S.E.2d 533, 535 (1954) (stating that an employer must pay benefits for partial incapacity to compensate a worker for his "loss of *earning power*," or "the impairment of the claimant's *earning capacity*" (emphases added)); Bay Concrete Constr. Co. v. Davis, 43 Va. App. 528, 539, 600 S.E.2d 144, 150 (2004) (explaining that partial incapacity benefits are calculated by considering the average weekly wage the claimant "is *able to earn*" (emphasis added)); Pilot Freight Carriers v. Reeves, 1 Va. App. 435, 441, 339 S.E.2d 570, 573 (1986) (stating that benefits under Code § 65.1-55 (now Code § 65.2-502) cover "losses occasioned by the impairment of the claimant's *earning capacity*" (emphasis added)).

By paying an injured employee for his diminished earning capacity, the legislature necessarily chose not to make the worker whole for wages that his industrial injury otherwise prevented him from earning, as the majority's theory suggests, but instead chose to pay him for a more abstract loss. See Pilot Freight Carriers, 1 Va. App. at 440, 339 S.E.2d at 572. This Court explained this distinction in Pilot Freight Carriers. It first recognized that "[t]he degree of disability under Code § 65.1-55 [now Code § 65.2-502] is determined by comparing average weekly wages which the employee actually earns before the injury and the average weekly wage

- 13 -

that he is able to earn after the injury." Id. Quoting an earlier version of the same treatise cited

by the majority, this Court then stated that:

> "It is at once apparent that the two items in the comparison are not quite the same. Actual earnings are a relatively concrete quantity . . . . Earning capacity, however, is a more theoretical concept. It obviously does not mean actual earnings, since the legislature deliberately chose a different phrase for the post-injury earnings factor . . . . But the concept of wages he 'is able' to earn cannot mean definite actual wages alone, especially in the absence of a fixed period of time within which post-injury wages are to be taken as controlling."

Id. (alterations in original) (quoting 2 A. Larson, The Law of Workmen's Compensation § 57.21

(1980)).[6]

Indeed, the cases cited by the majority acknowledge that economic conditions do not

prevent a claimant from receiving compensation for his diminished earning capacity, even if

those economic conditions result in the claimant's unemployment. Metro Mach. Corp. v.

Sowers, 33 Va. App. 197, 210, 532 S.E.2d 341, 347 (2000) (stating that "'the employer's

financial condition and the availability of alternative work do not affect the claimant's right to

compensation due to an impaired capacity to perform his pre-injury duties'" (quoting Consol.

Stores Corp. v. Graham, 25 Va. App. 133, 137, 486 S.E.2d 576, 578 (1997))); Carr v. Va. Elec.

---

[6] Other states with statutes similar to Code § 65.2-502 have recognized this same distinction between lost wages and loss of earning capacity. See, e.g., Hendricks v. Am. Stores, 809 P.2d 1076, 1078 (Colo. 1990) (stating that Colorado pays temporary partial disability benefits based on a worker's "impairment of his earning capacity," which "means the loss of ability to earn, not simply lost wages"); Harle v. Work. Comp. App. Bd., 658 A.2d 766, 769 (Pa. 1995) (stating that Pennsylvania pays partial disability benefits based on the "earning power" of the employee after his injury, which may be different than the amount "the employee is receiving in actual wages after the injury"); see also West Point Pepperell v. Green, 252 S.E.2d 55, 56 (Ga. Ct. App. 1979) (holding that compensation should not be denied based on a plant shutdown in light of the fact that Georgia determines partial disability benefits based on "the difference between [a worker's] average weekly wage before the injury and the average weekly wage she was able to earn thereafter"); cf. Shaw Indus. Inc. v. Shaw, 586 S.E.2d 80, 82 (Ga. App. Ct. 2003) (suggesting that the worker's "actual post-injury wages" are relevant, although not necessarily dispositive, to determine the amount a worker is "able to earn" after being injured).

- 14 -

& Power Co., 25 Va. App. 306, 487 S.E.2d 878 (1997) (stating that "'[t]he threshold test for compensability is whether the employee is *able* fully to perform the duties of his pre-injury employment'" (quoting Celanese Fibers Co. v. Johnson, 229 Va. 117, 120, 326 S.E.2d 687, 690 (1985)) (emphasis added)).[7]  The majority asserts that these cases stand for the proposition that an unemployed claimant's entitlement to benefits under Code § 65.2-502 depends upon the causal relationship between the unemployment and the claimant's industrial injury, as determined by the wage loss suffered by the claimant in relation to similarly situated non-restricted employees.  Supra at 8-9.

The majority misunderstands these cases.  These cases make such a comparison not because such a causal relationship is required under the statute, but because such a comparison appropriately demonstrated the extent of the claimant's incapacity for work, or his inability to earn wages, in those particular cases.  See Sowers, 33 Va. App. at 208-09, 532 S.E.2d at 347; Graham, 25 Va. App. at 136-37, 486 S.E.2d at 577-78; Carr, 25 Va. App. at 310-12, 487 S.E.2d at 880-81.  In every one of those cases, this Court affirmed the commission's award of benefits to the claimant despite the fact that, due to economic conditions, the injured employee suffered no wage loss over and above the wage loss of other employees; rather, the injured employee in each of those cases had a diminished earning capacity as the result of his industrial injury, and that is what entitled him to benefits.  See Sowers, 33 Va. App. at 208-09, 532 S.E.2d at 347; Graham, 25 Va. App. at 136-37, 486 S.E.2d at 577-78; Carr, 25 Va. App. at 310-12, 487 S.E.2d

---

[7] The majority also cites Rodriguez v. Stouffer Concourse Hotel, No. 160-73-71, 1998 VA Wrk. Comp. LEXIS 3984 (Dec. 21, 1998), in support of its conclusion.  My response is two-fold.  First, we are not bound by opinions of the commission.  NiSource, Inc. v. Thomas, 53 Va. App. 692, 711, 674 S.E.2d 581, 591 (2009).  Second, and more importantly, the commission itself, in this very case, has abandoned the reasoning expressed in Rodriguez in light of our more recent controlling opinions in Sowers and Lamb.  See Testerman v. Util. Trailer Mfr. Co., No. 226-77-65, 2010 VA Wrk. Comp. LEXIS 290, at *3-4 (June 9, 2010) (analyzing this Court's decision in Sowers in making its decision).

- 15 -

at 880-81. Because we affirmed the awards of benefits in those cases, precedent directs that we do the same in this case.

I am further persuaded that today's decision by the majority is in error because it is inconsistent with our case law interpreting Code § 65.2-500. This is significant because Code § 65.2-500 pays benefits based on *total* "incapacity for work," just as Code § 65.2-502 pays benefits based on *partial* "incapacity for work." Thus, these two sections differ only in the degree of incapacity for which they compensate the claimant, not the policy upon which the award is based. See, e.g., Pilot Freight Carriers, 1 Va. App. at 441, 339 S.E.2d at 573 (explaining that partial incapacity benefits and total incapacity benefits both "cover losses occasioned by the impairment of the claimant's earning capacity"). This Court has already held that a claimant is entitled to benefits for total incapacity even though it could not be said that, but for his injury, the claimant lost wages. Allegheny Airlines v. Merillat, 14 Va. App. 341, 344-45, 416 S.E.2d 467, 469-70 (1992). In Allegheny Airlines, this Court explicitly rejected an employer's contention "that Code § 65.1-54 [(now Code § 65.2-500)] requires wage loss [as the result of an industrial injury]," holding that the statute "contains no such requirement." Id. at 344-45, 416 S.E.2d at 469-70. Instead, "compensation under [Code] § 65.2-500 is predicated upon the effect of the injury on the [claimant's] capacity to earn wages."[8] Lawrence J. Pascal, Virginia Workers' Compensation, Law and Practice § 5.05 (3d ed. 2000) (citing to Allegheny Airlines generally).

Since the theory for payment under Code §§ 65.2-500 and 65.2-502 is the same, we should read the two sections in harmony. Indeed, by holding as it does today, the majority

---

[8] At oral argument, the employer agreed that had Testerman been receiving temporary total disability benefits instead of working a light-duty job, he would have been entitled to receive compensation throughout the layoff.

- 16 -

creates a peculiar scheme. If a claimant has absolutely no ability to work, he is entitled to benefits even if he cannot prove that, but for his injury, he would have continued to earn the same (or any) wages after his injury. See Code § 65.2-500; Allegheny Airlines, 14 Va. App. at 344-45, 416 S.E.2d at 469-70. However, if a claimant has a partial incapacity for work resulting from an industrial injury, he is not entitled to benefits for that partial incapacity unless he can prove that, but for his injury, he would have otherwise continued to receive wages. This inconsistency, of course, never arises if Code §§ 65.2-500 and 65.2-502 are read harmoniously, as this Court is obligated to do. See Oraee, 270 Va. at 498, 621 S.E.2d at 52.

For these reasons, I cannot adopt the majority's view. Therefore, I must also reject the majority's additional rule that a claimant must prove his disability was the reason he was unable to market his remaining capacity for work.[9] Instead of the rule espoused by the majority today, I would consider the commission's award of benefits in light of its well-established role as fact-finder to "compare the claimant's pre-injury average weekly wage to the wage he is *able to earn* after the injury to determine whether he is entitled to total or partial disability benefits and, if so, at what rate."[10] Bay Concrete Constr. Co., 43 Va. App. at 539, 600 S.E.2d at 150. Finally, in reaching this conclusion, I am ever mindful of the fact that

---

[9] I must note that a claimant's initial entitlement to benefits under Code § 65.2-502, despite economic conditions that preclude actual wage loss, should not be confused with the separate question as to whether the claimant has subsequently lost his entitlement to those benefits by failing to take reasonable efforts to market his residual work capacity. See Herbert Bros., Inc. v. Jenkins, 14 Va. App. 715, 717, 419 S.E.2d 283, 284 (1992) ("In order to continue to receive benefits under the Workers' Compensation Act, a claimant who has been injured in a job-related accident must market his remaining capacity to work.") Of course, since the parties stipulated that the claimant here had reasonably marketed his residual capacity, there is no need to analyze this issue.

[10] Here, the claimant testified that he had continued to work while the plant was shut down during prior inventories and that some of his co-workers remained employed during this shutdown. The majority, however, has chosen to adopt those facts that support its conclusion by accepting the competing testimony of the claimant's manager, supra at 2, despite this Court's

> the purpose of the Workers' Compensation Act is to provide compensation to an employee for the loss of his opportunity to engage in work, when his disability is occasioned by an injury suffered from an accident arising out of and in the course of his employment. The Act should be liberally construed in harmony with its humane purpose.

Sowers, 33 Va. App. at 209, 532 S.E.2d at 347 (quoting U.S. Air, Inc. v. Joyce, 27 Va. App. 184, 189, 497 S.E.2d 904, 906 (1998)).

Here, the commission determined that Testerman was incapable of performing his original duties due to a work-related injury, resulting in a diminished earning capacity. Accordingly, he was entitled to compensation. The employer was permitted to terminate that compensation when it provided him selective employment consistent with his incapacity at his previous wage. The employer then, for its own economic benefit, ended that selective employment. However, "[a]fter an economic layoff from selective employment, [such] an employee remains entitled to benefits until he either fully recovers and is released to pre-injury work, or until the employer offers him other selective employment." Lamb, 33 Va. App. at 196, 532 S.E.2d at 341. Because neither alternative is the case here, I conclude that Testerman was entitled to a reinstatement of compensation for his injury. Therefore, I would affirm the commission.

---

obligation to examine the facts in the light most favorable to the claimant, who prevailed below. Crisp v. Brown's Tyson's Corner Dodge, Inc., 1 Va. App. 503, 504, 339 S.E.2d 916, 916 (1986). Nevertheless, the facts, as they are, seem to require further examination by the fact-finder to evaluate the new factors listed by the majority. Thus, even if I were to agree with the rule set by the majority, I would still remand for further proceedings because of the fact-finding necessarily required by that rule.